## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MEDDICC LTD., | Civil Action No. |
| Plaintiff, | |
| v. | |
| 01CONSULTING LLC D/B/A MEDDIC ACADEMY and DARIUS LAHOUTIFARD. | |
| Defendants. | |

### COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff MEDDICC Ltd. ("MEDDICC" or "Plaintiff"), by its attorneys, allege the following facts in support of its Complaint for Declaratory Judgment against Defendants 01Consulting LLC d/b/a MEDDIC Academy ("01Consulting") and Darius Lahoutifard ("Lahoutifard") (collectively, "Defendants") alleges as follows:

### PARTIES

1.     Plaintiff MEDDICC is a private limited company, offering sales training and consulting, and organized and existing under the laws of the United Kingdom, doing business in this judicial district, with a principal place of business located at 2 The Crescent, Wisbeh, Cambridgeshire, United Kingdom, PE13 1EH.

2.     Upon information and belief, Defendant 01Consulting LLC d/b/a MEDDIC Academy is a limited liability company, organized and existing under the laws of the State of California, doing business in this judicial district, with a principal place of business located at 1133 Camelback St. #13128, Newport Beach, California, 92658. Upon information and belief,

01Consulting is the exclusive licensee of the federal registration for MEDDPICC that is the subject of the dispute in this Action.

3.      Upon information and belief, Defendant Darius Lahoutifard is an individual residing at 940 Gardenia Way, Corona Del Mar, California, 92625, and doing business within this District.  Upon information and belief, Lahoutifard is the sole managing member of 01Consulting and owner of federal registration MEDDPICC that is the subject of the dispute in this Action.

<u>**JURISDICTION AND VENUE**</u>

4.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338, as this case arises under the Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)).  Pursuant to 15 U.S.C. § 1119 MEDDICC further seeks to cancel or restrict the Registration of the Alleged Mark (defined below) against Defendants.  This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. § 2201-2202.

5.      An actual and justiciable controversy exists between the parties regarding the non-infringement of Lahoutifard's purported trademark rights and the validity and enforceability of those rights.

6.      On information and belief, this Court has personal jurisdiction over Defendants because Lahoutifard's company, 01Consulting, has specific and continuous contacts in this District and the Commonwealth of Pennsylvania.  Further, Lahoutifard's online business reaches into all 50 states, including Pennsylvania and, specifically, the jurisdiction encompassed by this District. Upon information and belief, 01Consulting, and Lahoutifard through 01Consulting, has in the past conducted and does presently conduct business in this District by marketing, promoting, advertising, offering for sale, and distributing products and services either through dealers or direct to consumers.  Upon further information and belief, Defendants have purposefully and voluntarily

placed its products and services, including the products sold and services offered under the trademark at issue in this action, into the stream of commerce with the expectation that consumers in this District and in the Commonwealth of Pennsylvania will purchase such products and services.

7.      Further, Lahoutifard, on behalf of 01Consulting purposely availed himself to this District and the Commonwealth of Pennsylvania by sending a Cease-and-Desist Letter to one of Plaintiff's corporate representatives, Richard Dunkel, on October 13, 2023.  In said letter, Defendants complained about the ongoing actions of Plaintiff and threatened legal action. Defendants' actions therefore reach into this District and in the Commonwealth of Pennsylvania and directly relate to present controversy between the parties.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1)-(2) because 01Consulting, and Lahoutifard whether personally and/or through 01Consulting, does business in this District.

9.      Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to MEDDICC's claims occurred in this District, specifically, Defendants have made allegations of infringement against MEDDICC within this District.  Specifically, Lahoutifard as purported brand owner, and on behalf of 01Consulting, sent a Cease-and Desist Letter to one of Plaintiff's corporate officers who resides in this District.

## FACTUAL BACKGROUND

### History of the Parties and Relevant Trademark

10.      Richard Dunkel, the former Chief Customer Officer and current consultant for MEDDICC, as well as John McMahon, and Jack Napoli are co-creators of the MEDDIC "methodology" and coined the term MEDDIC in 1996.  The term "MEDDPICC" is a variation of "MEDDIC" methodology.

3

11.     Mr. Dunkel, while working at his previous employer, assisted with sales development and sales training.  During this time, in the 1990s, he created a training program where new hires at the company would attend his intermediate sales training and would learn more advanced sales techniques.

12.     One of the key exercises Mr. Dunkel used in his class, and which he still uses to date, is called "Why do we win? Why do we lose? Why do deals slip?"  Each class had approximatively a dozen attendees, which would be divided in small groups to do this exercise. The attendees would list out all of their answers to these three questions, then he would take their answers and organize them into groups with the same key features.

13.     After Mr. Dunkel had run several training sessions using this exercise, Mr. Dunkel noticed that he kept finding the same features of sales "methodology," or as a sales qualification framework, which are: (i) metrics, (ii) economic buyer, (iii) decision criteria, (iv) decision process, (v) pain, and (vi) champions.

14.     In or around the spring of 1996, Mr. Dunkel came up with the acronym "MEDDIC" as a handy device to explain these characteristics.  He developed this acronym based on the first letters of the six features of that methodology.  He realized that this provided only one vowel, but that if he replaced the term "pain" with "identify pain", he would have two.  From this Mr. Dunkel began to use the acronym "MEDDIC", standing for "Metrics, Economic buyer, Decision Criteria, Decision Process, Identify pain, and Champions".  The two "D"s in the acronym also had the advantage of distinguishing it from the word "medic" and its potential medical associations.

15.     MEDDPICC is a subsequent modification of MEDDIC and stands for "Metrics, Economic Buyer, Decision Criteria, Decision Process, Paper Process, Identify, the Pain, Champion, and Competition".

16.    Based on information and belief, as a subsequent outgrowth of the MEDDIC acronym and methodology, an individual named John McMahon (who serves as a board member to reputable companies like MongoDB and Snowflake), first adopted the acronym "MEDDPICC" as a convenient reference to this modified sales technique.

17.    In fact, Mr. McMahon authored a book called "The Qualified Sales Leader," which contains a chapter about MEDDPICC.  Mr. McMahon is also on record, stating that he created MEDDPICC.  *See* **Exhibit "A"** - https://www.sprinklr.com/blog/winning-sales-culture/.

18.    Similarly, the MEDDPICC acronym merely describes a known sales training method or technique and outgrowth of the MEDDIC method and is not used in connection with a specific branded product or service being exclusively offered by Mr. Dunkel, MEDDICC Ltd, or any one third party.

19.    Mr. Andrew Whyte, the Chief Executive Officer of MEDDICC, received his first training on what was then described as the "MEDDPICC sales methodology," in 2014 while working as an Account Executive at a company named Sprinklr.

20.    Sprinklr also outsourced some of the training of their sales force in the MEDDIC and MEDDPICC sales methodologies under those names to a company called Force Management based in the United States.

21.    Mr. Whyte continued to teach and provide MEDDPICC related training subsequent to his employment with Sprinklr and has developed an independent online and social media presence where he posts regularly on the MEDDICC and MEDDPICC methodologies and continues to promote those methodologies.

22.     Upon information and belief, Defendants knew that MEDDPICC was an acronym and a generic (and/or highly descriptive) term that identifies a known sales methodology that has been used throughout the industry for multiple decades.

23.     Despite knowing the term MEDDPICC was generic or at least merely descriptive of a commonly used sales methodology and functions as a short-hand acronym, Lahoutifard filed an application with the United States Trademark Office ("USPTO") to formally register the term "MEDDPICC" as a trademark on March 24, 2020.  ***See* Exhibit "B".**

24.     As part of that application, filed March 24, 2020, for the term MEDDPICC, subject of USPTO Trademark Application Serial No. 88845076, Lahoutifard executed a declaration stating that "To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

25.     Upon information and belief, at the time of that filing, Lahoutifard knew, or should have known, that many other persons and legal entities had "the right to use" the MEDDPICC wording, as it had been a known sales technique in the industry since at least as early as 2006.

26.     As part of that Application filing, and as later amended, Lahoutifard claimed a first use in commerce, and first use anywhere of the MEDDPICC wording as it related to sales training services of July 1, 2013; and as it related to downloadable e-books in the field of business on March 24, 2020, both dates being far after adoption and use of the MEDDPICC wording in the industry to identify a sales training methodology.

27.    In fact, Lahoutifard has previously acknowledged that the MEDDIC / MEDDPICC methodologies were developed during his employment at a United States company called PTC. Upon information and belief, Lahoutifard worked at PTC from 1992-1995.

28.    The USPTO thereafter issued, and Lahoutifard received, a registration for the wording "MEDDPICC" as a standard character mark (the "Alleged Mark") on September 21, 2021.  A true and correct copy of the registration certificate for U.S. Registration No. 6,489,058 is attached hereto as **Exhibit "C"**.

29.    The Alleged Mark has not obtained incontestability under 15 U.S.C. §1065, as it has been registered for less than five years and a Declaration of Incontestability has not been filed.

**The Alleged Mark is Generic and/or Merely Descriptive Nature of the Wording**

30.    According to the Registration Certificate, Mr. Lahoutifard claimed that the first use date of the Alleged Mark in Class 41 (educational courses) is as early as July 1, 2013, and that the first use date of the Alleged Mark in Class 9 (downloadable videos and e-books) is as early as March 24, 2020.  *See* Exhibit "C".

31.    However, the term MEDDPICC has been used widely throughout the industry as a generic for, and/or a merely descriptive characterization of a sales technique at least ten years before the earliest date of use claimed by Mr. Lahoutifard.  This use predates that of Defendants.

32.    Upon information and belief, John McMahon first adopted the MEDDPICC acronym around 2006.

33.    Many companies began using the MEDDPICC acronym as a descriptive term starting at least as early as 2006.  For example, a company named Continuous Improvement Solutions provided multiple trainings on the MEDDPICC methodology to international businesses with sales representatives in the United States, United Kingdom, and around the world between

2006 and 2012.  This included the global rollout in 2010 of the MEDDPICC methodology for Avid Technology, which is a leading audio tech business with offices in the United States, United Kingdom, and around the world.

34.    Upon information and belief, Force Management was also an early adopter of the term MEDDPICC and began using the term around 2006.

35.    In 2012, Mr. McMahon, together with Steve Amman, formed a consultancy called the Sales MEDDIC Group ("SMG"), which also provided training on MEDDIC and MEDDPICC techniques.

36.    In or around July 2012, Sprinklr used the MEDDPICC name and methodology as the sales framework at the company.

37.    In or around 2014, others began to use the term MEDDPICC on social media websites to describe the sales methodology.  For example:

- First Tweet Mentioning MEDDPICC on March 19, 2014: https://twitter.com/naja2183/status/446233509741723648?s=20

- Second Tweet Mentioning MEDDPICC on October 2, 2015: https://twitter.com/tcbmartin/status/650707191742205952?s=20

- First MEDDPICC meme found on Twitter: https://twitter.com/salesmeddic/status/788754653555011584

- July 15, 2017, Brian Berlin posted an article on LinkedIn titled "MEDDIC, MEDDICC or MEDDPIC? and where it originated from": https://www.linkedin.com/pulse/meddic-meddicc-meddpic-brian-berlin/

- August 15, 2017, Podcast released on MEDDPICC by Scott Ingram: https://top1.fm/meddpicc-sales-process/

- August 15 2017, MEDDPICC Video posted by David Weiss on YouTube:

https://www.youtube.com/watch?v=qktXmrGA2ug.

Third party Evidence Examples attached hereto as **Exhibit "D".**

38.     The acronym MEDDPICC is thus one of several descriptive variations.  All of these terms are used in the United States and elsewhere to describe sales methodologies or sales qualification methodologies.  For example:

- "Whether it's MEDDIC, MEDPICC, or some other combination of d, i, and c, the fundamental idea is the same: a strategic **sales methodology** that helps teams qualify and close deals better and faster." *See* https://www.variance.com/guides/meddpicc-meddic (emphasis added).

- "MEDDIC, MEDDICC OR MEDDPICC? MEDDIC (and all of its variations) are a **sales qualification methodology** that's especially useful to B2B enterprise sales organizations. MEDDIC helps organizations to ensure they are working on the right deals and focusing on the right things to win" *See* https://meddicc.com/meddpicc-sales-methodology-and-process (emphasis added).

- "The MEDDPICC **sales process** is a B2B sales qualification methodology." *See* https://www.getweflow.com/blog/meddpicc  (emphasis added).

Additional Third party Evidence Examples attached hereto as **Exhibit "E".**

39.     Upon further information and belief, it is only recently that Lahoutifard associated himself with MEDDPICC, having personally railed against MEDDPICC.  Upon information and belief, Lahoutifard often told customers that MEDDPICC was harder to implement and that the extra "P" and "C" from MEDDIC was unnecessary.

40.     In fact, on a video Lahoutifard uploaded to his YouTube channel, he took no ownership to, or credit for the development of, the term MEDDPICC, and instead stated: "Actually, I think that it's wrong to call it anything else than MEDDIC. . . Let's look at these letters and see if they make sense. Actually, you will see that they either don't make sense and are even wrong or unnecessary." Submitted hereto as **Exhibit "F"** (at 0:15 to 2:05). Upon information and belief, this video was posted on or around January 2021.

41.     Further, as seen in the video, Lahoutifard refers to the term MEDDPICC as an acronym and states that people only add extra letters to the acronym to sound more sophisticated. *See* Exhibit "F" (at 0:15 to 2:05).

42.     Thus, even Lahoutifard himself concedes an aversion to MEDDPICC, thus renouncing any ownership of the wording as a trademark.

43.     As a result of both Lahoutifard's own comments, and the large amount of third-party publicly accessible evidence, Defendants lack the ability to establish the requisite distinctiveness in the MEDDPICC wording so as to permit exclusive rights as a trademark and act as a source identifier of Defendants goods and services.

**<u>Defendants Seeks to Enforce the Alleged Mark Against Plaintiff</u>**

44.     On October 13, 2023, Mr. Lahoutifard sent a demand letter to Mr. Dunkel (within this District), alleging that MEDDICC is infringing the Alleged Trademark (the "Cease-and-Desist Letter"), in particular, through (1) its use of the acronym MEDDPICC as a hashtag at the bottom of his positing on a Linkedin social media page, and (2) the use of the term in describing the history of the MEDDIC method and the future direction of customer-seller dynamics in publications. A true and correct copy of the Cease-and-Desist Letter is attached hereto as **Exhibit "G"**.

45.    The Cease-and-Desist Letter also alleged infringement of the Alleged Mark by Plaintiff for clearly non-trademark use.

46.    Since sending this initial Cease-and-Desist Letter, Defendants have actively engaged in a series of actions to unfairly compete and enforce their alleged trademark rights upon MEDDICC through non-legal avenues.  For example:

- Demand Letter of October 5, 2023, sent to MEDDICC's customer, Crawford Technologies, alleging trademark infringement by MEDDICC and wrongfully stating that there was an ongoing litigation between Defendants and MEDDICC;

- Notice of Infringement Letter of February 22, 2024, to Twitter / X, improperly alleging trademark infringement by MEDDICC of the Alleged Mark;

- Notice of Infringement Letter of February 14, 2024, to Amazon.com, improperly alleging trademark infringement by MEDDICC of the Alleged Mark; and

- Notice of Infringement Letter on or around October 13, 2023, to LinkedIn, improperly alleging trademark infringement by MEDDICC.

47.    Most recently, counsel for MEDDICC received an additional letter from Defendants' counsel, denying MEDDICC's right to use the MEDDPICC acronym.  A true and correct copy of said letter is attached hereto as **Exhibit "H"** (the "April 5, 2024 Letter").  Instead, Defendants alleged in the April 5, 2024 Letter that MEDDICC's use of the term MEDDPICC in the United States in connection with its goods and services is unlawful and constitutes trademark infringement and false designation of origin in violation of the Lanham Trademark Act, 15 U.S.C. § 1051 et. seq.  The April 5, 2024 Letter then requested that MEDDICC (1) immediately cease and desist from using the term in any matter in the United States; (2) provide a customer list detailing

the customers it provided its goods and services to; and (3) provide an accounting of the sales made by MEDDPICC in connection with its use of the term MEDDPICC by April 19, 2024.

48.    Given facts precipitating the filing of this Declaratory Judgment Action, including the original Cease-and-Desist Letter sent to MEDDICC, the April 5, 2024 Letter sent to MEDDICC threatening litigation after April 19, 2024, and the continuous trademark bullying and wrongful enforcement campaign by Defendants against MEDDICC, MEDDICC has a reasonable apprehension of being sued by Defendants for trademark infringement, and there is an actual and justiciable controversy between the parties.

49.    The substantial disagreement among the parties cannot be resolved without court intervention.

50.    Without court intervention now, MEDDICC will be left uncertain of its legal rights while avoidable damages allegedly accrue.

51.    As such, MEDDICC has filed this Complaint seeking Declaratory Relief.

**Defendants' Other Wrongful Behavior**

52.    As mentioned above, Defendants have been wrongfully and intentionally interfering with MEDDICC's actual and potential business relationships.

53.    Defendants have also intentionally made knowingly false statements of fact about Plaintiff and its goods and services.

54.    For example, Defendants have submitted false and misleading infringement notices to Amazon.com and X/Twitter and have also made false and misleading statements to Plaintiff's customers.

55.    In fact, Defendants, knowing that Crawford Technologies Inc. is a customer of MEDDICC, sent a letter to Crawford on October 5, 2023, stating that Crawford Technologies Inc.

is using a service provided by MEDDICC Ltd., a company "currently being sued by our client for trademark infringement." A true and correct copy of this letter is attached as **Exhibit "I"**. This was a false statement, as Defendants have never sued MEDDICC for trademark infringement, despite multiple threats. Instead, this statement was meant to intentionally interfere with MEDDICC's relationship with its customer via the false statements and cause financial and reputational harm to MEDDICC.

56.     On October 13, 2023, Defendants also sent a demand letter to Mr. Dunkel, an officer of Plaintiff, alleging trademark infringement by Plaintiff and demanding that Mr. Dunkel, and Plaintiff, cease using the MEDDPICC term on LinkedIn, despite Mr. Dunkel merely using the term in a descriptive and generic manner in telling "his story" and the story of the history of MEDDIC and MEDDPICC. See Exhibit "G". This letter was meant to purposefully interfere with Plaintiff's marketing efforts of its goods and services and cause financial and reputational harm to MEDDICC.

57.     Similarly, Defendants have reached out to various manufactures and distributors of MEDDICC's products (including publications offered by MEDDICC), including but not limited to, Amazon.com, thereby submitting false and misleading infringement notices, to purposefully interfere with its relationship with said companies and prevent MEDDICC from selling its products.

58.     For example, on February 14, 2024, Defendants filed a complaint with Amazon.com, stating that MEDDICC's listing for the book, "MEDDICC: The ultimate guide to staying one step ahead in the complex sale" by Andy Whyte, ASIN:1838239707, was infringing Defendants' trademark rights.

59.    MEDDICC submitted a dispute of the infringement notice to Amazon on or about February 29, 2024, explaining that the term "MEDDPICC" was merely descriptive and MEDDICC's use of the term was a non-trademark use.  After much back and forth, Amazon eventually reinstated MEDDICC's listing on April 6, 2024.

60.    The foregoing fraudulent complaint caused MEDDICC's product listing to be suspended for approximately 52 days, or portions thereof, resulting in lost sales, damage to reputation, and embarrassment triggered by this competitor's actions.

61.    The foregoing fraudulent complaint was false, in that MEDDIC's use of the term MEDDPICC was a non-trademark use, and Defendants did not have any valid basis for the complaint to Amazon.

62.    Upon information and belief, Defendants submitted the foregoing fraudulent complaint intentionally and with malice toward MEDDICC, with intent to harm MEDDICC, cause it to lose sales, and increase the sales and profits of Defendants.

63.    Defendants have also interfered with MEDDICC's ability to market its goods and services by contacting social media platforms, such as Twitter / X, by again, submitting false and misleading infringement notices.

64.    For example, Defendants submitted a takedown request of MEDDICC's Twitter / X account on February 22, 2024, alleging trademark infringement.  MEDDICC first appealed the takedown on February 24, 2024, which Twitter / X denied.

65.    Counsel for MEDDICC then further appealed the takedown to Twitter / X on February 27, 2024.  MEDDICC's account was restored on February 28, 2024.

66. The foregoing fraudulent complaint caused MEDDICC's Twitter / X account to be suspended for approximately 6 days, or portions thereof, resulting in lost sales and reputational harm.

67. The foregoing fraudulent complaint was false, in that MEDDICC's use of the term MEDDPICC was not an alleged trademark use in United States protectable by trademark law or rights, and Defendants did not have any valid basis for the complaint to Twitter / X.

68. Upon information and belief, Defendants submitted the foregoing fraudulent complaint intentionally and with malice toward MEDDICC, with intent to harm MEDDICC, cause it to lose sales, and increase the sales and profits of Defendants.

## **FIRST CLAIM**

### **DECLARATORY JUDGMENT OF NON-INFRINGEMENT AND UNENFORCEABILITY**

69. Plaintiff incorporates and realleges above paragraphs of the Complaint as though fully set forth here.

70. Mr. Lahoutifard, as the owner of the Alleged Mark, and 01Consulting, as the purported exclusive licensee of the Alleged Mark (as explained to Plaintiff in the October 13, 2023 cease and desist letter), have together repeatedly attempted to enforce the Alleged Mark against MEDDICC. Defendants have also alleged, through the April 5, 2024 Letter, that MEDDICC's use of the wording "MEDDPICC" is an infringement of Defendants' alleged trademark rights.

71. Infringement of a registered trademark is actionable under the Lanham Act, 15 U.S.C. § 1114(1), which permits an owner of a registered trademark to commence a civil action in U.S. District Court and obtain, if successful, injunctive and monetary relief including profits attributable to the infringement.

72.     Defendants' allegations and actions constitute a clear, unambiguous claim that MEDDICC's use of the wording "MEDDPICC" is an infringement of Defendants' alleged federal trademark and common law rights, and that MEDDICC must meet Defendants' demands or be faced with litigation.

73.     MEDDICC has denied that its good faith and fair use of the wording "MEDDPICC" in general, does or will create any likelihood of confusion with Defendants or their goods or services.

74.     The unreasonable demands and constant enforcement actions of Defendants against MEDDICC are intended to disrupt MEDDICC's lawful business, thereby, requiring an adjudication of the rights of the parties in the dispute identified herein, before MEDDICC suffers further damage.

75.     An actual case or controversy therefore exists within the Court's jurisdiction, concerning the validity of Defendants' alleged trademark rights, and the respective rights of the parties.

76.     MEDDICC's use of the acronym MEDDPICC will not cause consumer confusion, does not infringe upon any registered trademark owned by Defendants, does not constitute unfair competition under the Lanham Act, and does not constitute false designation of origin.

77.     MEDDICC has no adequate remedy at law and therefore seeks declaratory relief as set forth herein.

## **<u>SECOND CLAIM</u>**

### **DECLARATORY JUDGMENT OF TRADEMARK INVALIDITY AND CANCELLATION OF TRADEMARKS PURSUANT TO 15 U.S.C. § 1064 AND § 1119**

78.     Plaintiff incorporates and realleges above paragraphs of the Complaint as though fully set forth here.

79.     The Alleged Mark "MEDDPICC" is generic, is merely descriptive, lacks necessary distinctiveness, and has not acquired the requisite secondary meaning to legally function as a source identifier under applicable United States law.

80.     As detailed herein, the term "MEDDPICC" has been used to describe a common sales methodology in the United States for over two decades.  This use predates Defendants' use of the Alleged Mark in commerce, and any claim of exclusive rights by Defendants.

81.      Further, the MEDDPICC acronym continues to appear on several websites and in use by businesses that are engaged in the same or similar business as Defendants, offering sales qualification training whether as written materials or as live or recorded webinars.

82.     As detailed herein, even Mr. Lahoutifard himself acknowledges that MEDDPICC is a methodology.

83.     Further, the Alleged Mark is invalid and should be cancelled because it was procured through a fraudulent declaration made by Lahoutifard to the United States and Trademark Office ("USPTO").

84.     As detailed above, Lahoutifard executed a declaration stating that "To the best of the signatory's knowledge and belief, no other persons, except, if applicable, concurrent users, have the right to use the mark in commerce, either in the identical form or in such near resemblance as to be likely, when used on or in connection with the goods/services of such other persons, to cause confusion or mistake, or to deceive."

85.     Upon information and belief, at the time of that filing, Lahoutifard knew, or should have known, that many other persons and legal entities had "the right to use" the MEDDPICC wording, as it had been a known sales technique in the industry since at least as early as 2006.

86.     Lahoutifard's declaration to the USPTO was false in that Lahoutifard was not, and has never been, the exclusive user of the Alleged Mark in commerce.  Further, the declaration was also false in that Lahoutifard knew, or should have known, that given the extensive third-party use of the MEDDPICC acronym, the term was generic, or at best, remained merely descriptive of an industry sales methodology rather than as a source identifier for any particular brand of goods or services.

87.     In making this false declaration to the USPTO, Lahoutifard intentionally misled the USPTO for the purposes of obtaining its trademark registration, which would have otherwise been denied.

88.     Defendants' conduct and threats as described herein have caused, and will continue to cause, injury to Plaintiff.

89.     For the reasons set forth herein, Defendants' Alleged Mark is invalid pursuant to 15 U.S.C. § 1064 and § 1119 and should be cancelled as having been procured through fraudulent statements made to the USPTO.

90.     Lahoutifard's fraudulent misrepresentations to the USPTO was made with intent to deceive the USPTO and induce the USPTO to act in reliance of the misrepresentation.  As a result of Lahoutifard's conduct, the USPTO registered a trademark that otherwise should not have been issued.

91.     Further, pursuant to 15 U.S.C. § 1064 and § 1119, Defendants' Alleged Mark should therefore be declared invalid and ordered cancelled, as it is generic, merely descriptive, and/or lacks necessary distinctiveness to legally function as a trademark under applicable United States law.

92.     In addition, incontestable rights have not been acquired in the Alleged Mark.  No such right can be vested in a generic name, i.e., MEDDPICC, a name for a sales methodology, commonly used by those engaged in the same business as Defendants.

93.     Further, upon information and belief, numerous other people and companies in the sales and business community have been using MEDDPICC for a sales methodology for years prior to Defendants' first use of the Alleged Mark.

94.     Defendants have attempted to enforce the fraudulently procured mark against Plaintiff, which has caused and continues to cause Plaintiff damages to its business and reputation. Defendants' allegations of infringement against Plaintiff have and will continue to harm Plaintiff until such claims are resolved.

95.     An actual case or controversy therefore exists within the Court's jurisdiction, concerning the validity of Defendants' claimed trademark rights, and the respective rights of the parties.

96.     Plaintiff has no adequate remedy at law and therefore seek declaratory relief against the Defendants as set forth herein, including, without limitation, a declaratory judgment finding that the Alleged Mark is invalid and the cancellation of the registration for the Alleged Mark.

## THIRD CLAIM

### TORTIOUS INTERFERENCE WITH CONTRACT

97.     Plaintiff incorporates and realleges above paragraphs of the Complaint as though fully set forth here.

98.     At all times, valid contracts existed between Plaintiff and its vendors, suppliers, and customers.

99.     Defendants have knowledge (actual and/or constructive) of Plaintiff's contracts with vendors, suppliers, and customers.

100.    Defendants acted intentionally to harm Plaintiff by interfering with the contractual relationships between Plaintiff and its vendors, suppliers, and customers.

101.    As detailed above, Defendants have interfered with Plaintiff's relationships with its customers by sending demand letters to Plaintiff's customers.

102.    As detailed above, Defendants tortiously interfered with the contract between MEDDICC and Crawford Technologies, Inc.

103.    Defendants' tortious interference was improper because Defendants' interference did not represent legitimate business competition, and Defendants had no legal or contractual right, privilege, or justification to interfere.

104.    As detailed above, the Alleged Mark is generic, or at best, merely descriptive, and Plaintiff's use of the term "MEDDPICC" was in a non-trademark manner.  There was therefore no legitimate justification for Defendants to interfere with Plaintiff's contractual relationships.

105.    Defendants had a motive to interfere with Plaintiff's contractual relationships to advance Defendants' own interests.

106.    Defendants sought to advance their own interests by interfering with Plaintiff's contractual relationship.  Specifically, Defendants sought to limit competition in the sales methodology field to increase their sales of their goods and services.

107.    As detailed above, but for Defendants' wrongful actions, including their intentional enforcement campaign, Defendants tarnished Plaintiff's goodwill, and disrupted Plaintiff's current business contracts and relationships with, both its distributors of its sales methodology goods and clients/customers of Plaintiff's sales methodology goods and services.

108.    Protecting Plaintiff's prospective contractual interest is in the public interest.  In particular, it allows customers/clients and distributors to have options when making business and/or purchasing decisions.

109.    Defendants intended to inflict financial farm on Plaintiff in furtherance of their private and unlawful economic objectives.

110.    Through the actions described herein, Defendants have intentionally interfered with Plaintiff's prospective contractual relationships.

111.    As a direct and proximate result of Defendants' actions, and as a result of Defendants' unjustified and intentional tortious interference, Plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, Plaintiff's loss of profits, Defendants' unlawful gains, Plaintiff's loss of customer and manufacturer relationships, and Plaintiff's loss of goodwill and reputation.

## **FOURTH CLAIM**

## **TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS**

112.    Plaintiff incorporates and realleges above paragraphs of the Complaint as though fully set forth here.

113.    At all relevant times, Plaintiff and its customers/clients and distributors had ongoing business relationships relating to Plaintiff's sales methodology related goods and services. Plaintiff reasonably believed that this relationship would continue, and the parties would enter into future contracts if not for Defendants' interference.

114.    By way of non-limiting example, Plaintiff has products listed on Amazon.com, which were successfully being purchased by customers throughout the United States.  But for

Defendants' interference, Plaintiff would have entered into additional contracts with both Amazon.com and future customers looking to purchase Plaintiff's sales methodology goods.

115.    Defendant acted intentionally harm Plaintiff by interfering with the prospective additional contractual relationships between Plaintiff and its customers/clients and distributors/

116.    Specifically, and as detailed above, by purposefully engaging in their enforcement campaign, Defendants have intentionally interfered with and harmed Plaintiff's ability to promote, market, and/or provide its sales methodology related goods and services to its customers.

117.    Defendants are competitors to Plaintiff in the sales methodology industry.

118.    Defendants knew or should have known that Plaintiff had sales and distribution relationships for its sales methodology related goods and services.  Despite such knowledge, Defendants willfully and intentionally interfered with Plaintiff's relationship with said customers and distributors to the detriment of Plaintiff.

119.    Defendants knew or should have known that continuous actions via an enforcement campaign would interfere with and harm Plaintiff's ability to advertise, market, offer for sale, sell and provide its sales methodology related goods and services to its customers.

120.    Defendants' interference in the prospective contractual relationship between Plaintiff and its customers/clients and distributors was improper because Defendants' interference did not represent legitimate business competition, and Defendants had no legal or contractual right, privilege, or justification to interfere.

121.    As detailed above, the Alleged Mark is generic, or at best, merely descriptive, and Plaintiff's use of the term "MEDDPICC" was in a non-trademark manner.  There was therefore no legitimate justification for Defendants to interfere with Plaintiff's prospective contractual relationships.

22

122.    Defendants had a motive to interfere with Plaintiff's prospective contractual relationships to advance Defendants' own interests.

123.    Defendants sought to advance their own interests by interfering with Plaintiff's prospective contractual relationship.  Specifically, Defendants sought to limit competition in the sales methodology field to increase their sales of their goods and services.

124.    As detailed above, but for Defendants' wrongful actions, including their intentional enforcement campaign, Plaintiff would have entered into additional contracts with both its distributors of its sales methodology goods and future clients/customers of Plaintiff's sales methodology goods and services.

125.    Protecting Plaintiff's prospective contractual interest is in the public interest.  In particular, it allows customers/clients and distributors to have options when making business and/or purchasing decisions.

126.    Through the actions described herein, Defendants have intentionally interfered with Plaintiff's prospective contractual relationships.

127.    Through its wrongful conduct as described herein above, Defendants wrongfully and tortuously interfered with Plaintiff's prospective contractual relationships that it would have reasonably received in the absence of Defendants' interference.

128.    As a direct and proximate result of Defendants' actions, and as a result of Defendants' unjustified and intentional tortious interference, Plaintiff has been damaged in an amount to be determined at trial, including, but not limited to, Plaintiff's loss of profits, Defendants' unlawful gains, Plaintiff's loss of customer and manufacturer relationships, and Plaintiff's loss of goodwill and reputation.

**FIFTH CLAIM**

**TRADE LIBEL**

129.    Plaintiff incorporates and realleges above paragraphs of the Complaint as though fully set forth here.

130.    As set forth above, Defendants intentionally made knowingly false statements of fact about Plaintiff and its products through Defendants' actions of submitting false and misleading infringement notices to Amazon as well as making false and misleading statements to Plaintiff's customers.

131.    Defendants made these statements maliciously and willfully, with intent to cause harm to Plaintiff's business and reputation.

132.    Defendants' statements and actions were false when made, and Defendants knew or should have known that the statements were false when made.

133.    Defendants' statements and actions were made expressly concerning Plaintiff and its products and services, and were so understood by those who received Defendants' statements and actions to be referencing Plaintiff and its products and services.

134.    Defendants' foregoing fraudulent actions and statements have injured Plaintiff and its reputation in its business trade.

135.    Upon information and belief, Defendants' fraudulent infringement notices and product listing and customer communications were intentionally and willfully conducted with malice toward Plaintiff.

136.    As a result of Defendants' actions, Plaintiffs have been and continue to be damaged in an amount to be determined at trial.

137.    While an award of damages may be adequate to compensate Plaintiff for certain losses of particular sales and customers, an award of damages will not be adequate to compensate

Plaintiff for the damage to its reputation caused by Defendants. Plaintiff has suffered and will continue to suffer irreparable harm unless injunctive relief is granted.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment against Defendants and awarding Plaintiff:

A.     A Declaration of Plaintiff's lawful right to use the wording "MEDDPICC" without complaint or further interference from Defendants;

B.     A Declaration that Plaintiff's past and current use of the wording "MEDDPICC" does not infringe upon Defendants trademark rights in the Alleged Mark;

C.     A Declaration that Plaintiff's use of the wording "MEDDPICC" or similar wording does not create a likelihood of consumer confusion with Defendants' Alleged Mark or with any common law rights of Defendants;

D.     An Order pursuant to 15 U.S.C. § 1119 to rectify the Principal Register of the United States Patent and Trademark Office canceling Defendant Lahoutifard's Trademark for MEDDPICC, and such order shall be certified to the Director, who shall make appropriate entry upon the records of said Office;

E.     A permanent injunction enjoining and restraining Defendants and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, from:

       i.     making any false, fraudulent, or disparaging statements about Plaintiff;

       ii.     submitting any allegations of infringement to Amazon, any social media platform, and/or any other online portal concerning Plaintiff or its products or services;

       iii.     undertaking any actions or omissions, or facilitating or supporting any actions or omissions, that affect any of Plaintiff's product listings or services on Amazon.com any social media platform, and/or any other online portal;

F.     Actual damages, in an amount to be determined at trial;

G.     Disgorgement of Defendants' profits;

H.   Declaration that this is an "exceptional case" and an award of Plaintiff's attorneys' fees and costs under 15 U.S.C. § 1117; and

I.   Such other and further relief as this Court shall deem necessary and appropriate.

## REQUEST FOR JURY DEMAND

Please take notice that Plaintiff MEDDICC Ltd. demands a jury trial in this matter.

Respectfully submitted,

By:   */s/ Ryan N. Miller*
Ryan N. Miller
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Direct – 215-299-2901
Fax – 215-299-2150
RMiller@foxrothschild.com
*Attorneys for Plaintiff,*
*MEDDICC Ltd.*

Dated: April 30, 2024

26