## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MEDDICC LTD,
    **Plaintiff & Counterclaim Defendant,**

    v.

01 CONSULTING LLC d/b/a MEDDIC
ACADEMY, and DARIUS
LAHOUTIFARD,
    **Defendants & Counterclaim**
    **Plaintiffs.**

CIVIL ACTION

NO.  24-1836

## OPINION

From B2B to YOY, the business world is full of acronyms.  At the center of this trademark and unfair competition dispute is one that is ubiquitous in sales.  Coined in 2005, "MEDDPICC" represents a multi-step framework used by sales professionals to evaluate, manage, and ideally win business.  Defendant Darius Lahoutifard was not involved in MEDDPICC's conception.  Nevertheless, sixteen years after its genesis, he federally registered the term as his trademark.  While acknowledging that MEDDPICC is a term for a sales qualification methodology, Lahoutifard simultaneously claims that it also names the MEDDPICC-related sales training and consulting services provided by his firm, Defendant 01 Consulting LLC.

Plaintiff MEDDICC Ltd. directly competes with Lahoutifard to provide similar business training services.  But ever since Lahoutifard obtained his trademark, Plaintiff has found it increasingly difficult to refer to the subject of its services.  Following Lahoutifard's repeated accusations of trademark infringement, Plaintiff eventually decided that enough was enough.  It filed this action, seeking a declaration of noninfringement and of cancellation of Lahoutifard's trademark registration as well as bringing Pennsylvania common law claims for tortious

1

interference with contractual and prospective contractual relations and for trade libel. Lahoutifard counterclaimed for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1); counterfeiting under the Lanham Act, 15 U.S.C. § 1117;[1] unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); Pennsylvania common law trademark infringement and unfair competition; and, violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. C.S.A. § 201-1 *et seq*.

Pursuant to Federal Rule of Civil Procedure 56, Plaintiff now moves for summary judgment. For the reasons below, Plaintiff's Motion will be granted in part and denied in part.

## I. BACKGROUND

### A. Legal Background

Trademarks are "any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. Service marks have an identical definition and function with respect to "services." *Id.* "Although technically distinct, the terms are often used interchangeably, with no significant legal consequences." *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 855 (3d Cir. 1992).

"Trademarks and their precursors have ancient origins, and trademarks were protected at common law and in equity at the time of the founding of our country." *Matal v. Tam*, 582 U.S. 218, 224 (2017) (citations omitted). The twin aims of trademark law are to "help[] consumers

---

[1] Lahoutifard asserts his counterfeiting claim under 15 U.S.C. §§ 1114(1)(b), 1116(d). But looking at his requested relief and the statutory scheme, his claim actually arises under 15 U.S.C. § 1117. Moreover, calling it a "claim" is misleading. Section 1117 does not provide for a "standalone claim" but is rather "the basis for additional" remedies, *Lontex Corp. v. Nike, Inc.*, 107 F.4th 139, 158 (3d Cir. 2024), in cases constituting "hard core" or "first degree" trademark infringement under § 1114(1)(a), *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1079 (9th Cir. 2020) (quotation marks and citation omitted). It is specifically triggered by infringement of a registered trademark through the "knowing" or "willful" use of a "counterfeit mark." 15 U.S.C. § 1117; *see also Lontex*, 107 F.4th at 158 ("[C]ounterfeiting requires greater similarity between marks than other types of trademark infringement.").

identify goods and services that they wish to purchase, as well as those they want to avoid," and to protect the goodwill of a markholder's business from misappropriation by another. *Id.*; *accord Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985). Under federal law, "trademarks that are 'used in commerce' may be placed on the 'principal register,' that is, they may be federally registered." *Matal*, 582 U.S. at 224-25 (quoting 15 U.S.C. § 1051(a)(1)). The "system of federal registration helps to ensure that trademarks are fully protected and supports the free flow of commerce." *Id.* at 225.

### B. Factual Background

In the early 1990s, a software startup, Parametric Technology Corporation (PTC), found itself in need of a way of identifying sales opportunities compatible with its limited product capabilities. Through a process of trial and error, PTC's sales team took their best practices for managing business opportunities and distilled them into an acronym: MEDDIC. It stood for **M**etrics, **E**conomic Buyer, **D**ecision Criteria, **D**ecision Process, **I**dentify Pain, and **C**hampion. Each term represents a facet of a sales opportunity. For example, "Economic Buyer" refers to the process of identifying and meeting the individual at the client firm who has the final word on purchasing decisions. Likewise, "Decision Criteria" refers to learning and influencing the client's criteria for making a purchasing decision. Collectively, the letters in MEDDIC provide sales professionals with a framework for driving a particular sales opportunity to fruition. And because the framework can be applied repeatedly and integrated into firm-specific processes, MEDDIC is often referred to as a sales qualification methodology. In terms of MEDDIC's utility, the results speak for themselves. In the 1990s, PTC trained its sales force to use MEDDIC. Its revenues shot up from $1 million in 1989 to $1.1 billion in 1998.

MEDDIC has not remained a static concept; several variants have appeared over the

years.  Most importantly, in 2005, former PTC employees coined MEDDPICC.  MEDDPICC preserved the core sales qualification framework embodied in MEDDIC while adding two components: **P**aper Process and **C**ompetition.

Defendant Darius Lahoutifard is the founder and sole employee of Defendant 01 Consulting LLC, which does business as MEDDIC Academy.[2]  Lahoutifard offers training, coaching, education services focused on sales and sales leadership, which he provides through live workshops, online courses, coaching programs, and certification programs.

Lahoutifard first became familiar with MEDDIC as a sales manager for PTC.  He joined the firm in 1992 after being recruited by John McMahon.  Lahoutifard takes no credit for coining MEDDIC.  Still, he does claim some role in contributing to the iterative process that led to its creation.  He left PTC in 1995 or 1996.

In or around 2017, Lahoutifard launched MEDDIC Academy in response to recurring solicitations to train sales teams on MEDDIC and MEDDPICC.  After a period of featuring the MEDDPICC framework in his online courses, Lahoutifard decided to "elevate" MEDDPICC to a primary brand identifier for his educational services.  His intention "was that members of the sales community would associate the term with [him] as the source of structured, high-quality sales training and educational content."  But perceiving some risk in building his business around a term that he did not own or control, he resolved to obtain such control.

In September 2021, after some back and forth with the Patent and Trademark Office (PTO), Lahoutifard successfully obtained Registration Number 6,489,058—a federally registered trademark for the term "MEDDPICC" in standard characters.  The registration is for two

---

[2] Because Lahoutifard is the primary defendant, his name will be used throughout this opinion to refer to both Defendants.

trademark "classes":

> (1) "downloadable educational e-books in the field of business; downloadable educational video recordings featuring business lectures" (categorized as a class 9 trademark for an electrical and scientific apparatus); and,

> (2) "Education services, namely, providing on-line courses via non-downloadable videos in the field of business; Education services, namely, providing online non-downloadable educational course materials in the field of business; providing on-line non-downloadable educational e-books in the field of business (categorized as a class 41 service mark for education and entertainment).

*See Goods and Services*, USPTO, https://www.uspto.gov/trademarks/basics/goods-and-services (enumerating the class designations for trademarks).

Plaintiff MEDDICC Ltd. is a U.K.-based firm founded in 2020. It directly competes with Lahoutifard by also offering online sales training services and materials about MEDDPICC and its variants. Starting in October 2023, it became a frequent target of Lahoutifard's trademark enforcement activities. In particular, one of Plaintiff's clients received a letter accusing it of trademark infringement and demanding that it "immediately cease any and all uses of [Lahoutifard's] MEDDPICC trademark in connection with [Crawford's] activities." Shortly thereafter, Plaintiff's recently minted Chief Customer Officer posted on LinkedIn to announce that he would be joining the firm. His post included "#MEDDPICC." Lahoutifard sent him a letter alleging trademark infringement and simultaneously filed a notice of infringement with LinkedIn. Consequently, the post was taken down. Other infringement notices sent by Lahoutifard had similar repercussions for Plaintiff: Twitter/X temporarily suspended Plaintiff's Twitter account; YouTube temporarily blocked Plaintiff's page and certain videos; and, on two occasions, Amazon temporarily suspended sales of Plaintiff's book, of which at least one edition was titled "MEDDICC: Using the Powerful MEDDIC, MEDDICC, and MEDDPICC Enterprise Sales Framework to Close High-Value Deals and Maximize Business Growth." Further, Lahoutifard's counsel sent a letter to Plaintiff stating that its use of MEDDPICC to market and

sell online courses constituted trademark infringement.

## II.   *DAUBERT AS TO JOHN MCMAHON*

Before addressing Plaintiff's motion for summary judgment, it is necessary to first address Lahoutifard's motion to exclude the expert report and testimony of John McMahon pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  His Motion will be granted in part and denied in part.

### A.  Legal Standard

Federal Rule of Evidence 702—amended in response to the Supreme Court's decision in *Daubert*—governs the admissibility of expert testimony in federal court, providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 597 (explaining that Rule 702 assigns a "gatekeeping role" to federal courts with respect to expert testimony).  Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability[,] and fit."  *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).   Each of these restrictions will be addressed below.

### B.  Discussion

#### i.    *Fit*

"In assessing whether an expert's proposed testimony fits, [the question is] whether the expert testimony proffered is sufficiently tied to the facts of the case that it will aid the jury in

resolving a factual dispute." *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (quotation

marks, ellipses, brackets, and citation omitted).  "This condition goes primarily to relevance."

*Daubert*, 509 U.S. at 591.  "Expert testimony which does not relate to any issue in the case is not

relevant and, ergo, non-helpful."  *Id.* (quotation marks and citations omitted).  The standard for

relevance under *Daubert* "is a liberal one."  *Id.* at 587; *see also Pineda v. Ford Motor Co.*, 520

F.3d 237, 243 (3d Cir. 2008) ("Rule 702, which governs the admissibility of expert testimony,

has a liberal policy of admissibility." (citation omitted)).

For context, as explained further below, the parties' claims turn on whether Lahoutifard's

registered trademark is valid, which depends on whether the relevant consuming public (*i.e.*,

sales professionals) recognizes the mark as having an origin-indicating function.  *See A.J.

Canfield Co. v. Honickman*, 808 F.2d 291, 292-93 (3d Cir. 1986)  ("The jurisprudence of

genericness revolves around the primary significance test, which inquires whether the primary

significance of a term in the minds of the consuming public is the product or the producer.");

*E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 199 (3d Cir. 2008) ("Secondary

meaning exists when the trademark is interpreted by the consuming public to be not only an

identification of the product, but also a representation of the product's origin." (quotation marks

and citation omitted)).  McMahon's proposed testimony touches on the origin, evolution, and

concepts underlying the MEDDPICC sales qualification methodology; the prevalence of the

framework among sales teams, particularly those in the software industry; and, the sales

community's general understanding of the term MEDDPICC.  Accordingly, it would be highly

probative because it pertains directly to the mark's underlying subject matter and to an issue

central to the parties' claims.

However, Lahoutifard argues that McMahon provides improper legal opinions in

multiple respects.  "Federal Rule of Evidence 704 permits an expert witness to give expert testimony that 'embraces an ultimate issue to be decided by the trier of fact.'"  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (quoting Fed. R. Evid. 704).  But he is "prohibited from rendering a legal opinion" because it is not helpful to the factfinder.  *Id.*

Lahoutifard principally contends that McMahon offers legal testimony by opining that MEDDPICC is either a generic term or a descriptive term that lacks secondary meaning.  In the Third Circuit, however, whether a term "is generic or descriptive, and whether [it] has acquired secondary meaning, are questions of fact."  *E.T. Browne*, 538 F.3d at 192.  Accordingly, these issues of fact are appropriately the subject of expert testimony.  1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11.3 (5th ed. 2026) [hereinafter McCarthy]; *see also Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 982 (3d Cir. 1993) ("'Evidence of the public's understanding of the term at issue may be obtained from *any* competent source . . . .'" (brackets omitted; emphasis added) (quoting *In re Merrill Lynch, Pierce, Fenner, & Smith*, 828 F.2d 1567, 1570 (Fed. Cir. 1987)).

Moreover, contrary to Lahoutifard's contention, there is nothing wrong with McMahon's recitation of legal definitions for "generic" terms, "descriptive" terms, and "secondary meaning." Insofar as those definitions are accurately stated—which Lahoutifard does not contend otherwise—and constitute assumptions necessary for McMahon to form an opinion in the first instance, they do not render his proposed testimony inadmissible.  *See Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988) ("[A] witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible.  Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms."); *see also, e.g.*, *City of Almaty v. Ablyazov*, 2021 WL 5154110, at *12

(S.D.N.Y. Nov. 5, 2021) (holding that an expert may offer an opinion that rests on "assumptions about the law provided by . . . counsel"); *Farrow v. Contra Costa Cnty.*, 2019 WL 78839, at *23 (N.D. Cal. Jan. 2, 2019) ("An expert nevertheless may, in appropriate circumstances, rely on his understanding of the law and refer to the law in expressing an opinion regarding professional norms." (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004)).

With that said, other aspects of McMahon's report and proposed testimony are improper legal testimony. Specifically, after stating the relevant definitions, McMahon goes on to explain how those basic concepts affect a term's eligibility for trademark protection. For example, he states: "It is further my understanding that generic terms cannot be registered as trademarks." Such elaboration gets too close to "explaining the law to the jury." *Berckeley*, 455 F.3d at 217. He therefore may not testify regarding this understanding.

Similarly, McMahon may not offer testimony along the lines of his statement that Lahoutifard's claims "do not have any validity" because MEDDPICC "cannot be considered a trademark," "should never have registered," "would not seem to qualify as [a] trademark," and does not "warrant trademark protection." These statements are improper because they express "the legal implications" of McMahon's factual determinations about genericness and secondary meaning. *See* 4 *Weinstein's Federal Evidence* § 704.04 (2026). Plaintiff itself concedes that whether the registration should be held invalid and cancelled is a legal determination to be made by the factfinder. McMahon would invade the factfinder's province by directly stating the conclusion it should draw on this question and, accordingly, is precluded from doing so.

In all other respects, McMahon's testimony passes *Daubert*'s fit requirement because it is probative and stops just short of telling the factfinder what result to reach.

### ii.    Qualification

To satisfy *Daubert's* qualification requirement, an expert must possess "specialized knowledge regarding the area of testimony." *Betterbox Comm'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 327 (3d Cir. 2002) (quotation marks and citation omitted). "The basis of this specialized knowledge can be practical experience as well as academic training and credentials." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quotation marks and citations omitted). The qualification requirement is interpreted "liberally," *Pineda*, 520 F.3d at 244, and "a broad range of knowledge, skills, and training qualify an expert as such," *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (citation omitted). "'[A]t a minimum, a proffered expert witness must possess skill or knowledge greater than the average layman.'" *Waldorf*, 142 F.3d at 625 (ellipses omitted) (quoting *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987)).

On this requirement, Lahoutifard argues that McMahon is not qualified to opine on trademark distinctiveness, branding, or consumer perception. The force of this argument, however, is significantly diminished having narrowed the scope of McMahon's proposed testimony. And with respect to the topics to which he may still testify, he is eminently qualified.

McMahon undoubtedly possesses specialized expertise in the origin, evolution, and concepts of the MEDDPICC methodology. He was personally involved in the framework's inception, as well as that of its predecessor, MEDDIC.

He also possesses specialized knowledge of the sales industry and its use of the MEDDPICC methodology. McMahon's career spans forty years in the sales industry. In that time, he has held C-suite and board positions, managed thousands of sales representatives and managers, trained thousands of professionals in the MEDDIC/MEDDPICC methodologies, published a book about implementing and using MEDDPICC, and hosted a podcast featuring

10

content on structured sales processes, including the MEDDPICC methodology.  Indeed, Lahoutifard acknowledges that McMahon has "expertise in sales force leadership and training," is "a prominent figure in the sales training field," and "has long familiarity with [MEDDPICC] as a sales concept."  McMahon's knowledge of the sales industry and of sales qualification methodologies far exceeds that possessed by "the average layman."  *Id.*; *see also, e.g.*, *id.* at 627 (affirming that a witness possessed the "minimum qualifications necessary to testify as an expert" in vocational rehabilitation because of his "experience in the field" and "familiar[ity] with the relevant literature"); *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001) (qualifying an expert whose testimony was "derived largely from [his] own practical experiences throughout forty years in the banking industry").  Accordingly, he is qualified to opine on the sales industry's understanding of MEDDPICC.

### iii. Reliability

*Daubert* and Rule 702's reliability requirement demands that an expert's opinion rest on "good grounds" rather than on "subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590 (quotation marks and citation omitted).  In *Daubert*, the Supreme Court set out a list of factors that courts may consider in assessing "whether a theory or technique is scientific knowledge": whether the theory can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error, the existence and maintenance of standards controlling the technique's operation, and its general acceptance within the community.  *Id.* at 593-94; *see also Paoli*, 35 F.3d at 742 n.8 (summarizing important reliability factors in this Circuit).

*Daubert* was a case about scientific knowledge, yet "there are many different kinds of experts, and many different kinds of expertise."  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

137, 150 (1999).  Accordingly, "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  *Id.*; *see also Pineda*, 520 F.3d at 248 (recognizing that *Daubert*'s reliability factors "'are neither exhaustive nor applicable in every case.'" (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806-07 (3d Cir. 1997)).  The reliability determination is "flexible," and a district court enjoys "broad latitude when it decides how to determine reliability."  *Kumho Tire*, 526 U.S. at 141-42.

Here, Lahoutifard maintains that McMahon's testimony is unreliable because he did not employ a "formal methodology," such as a consumer survey, in concluding that MEDDPICC is either generic or lacks secondary meaning.  Instead, Lahoutifard contends, the only basis for these conclusions is McMahon's anecdotal say-so.  It is true that consumer surveys are a well-accepted tool for gauging whether a term is generic or has secondary meaning.  *See, e.g.*, *E.T. Browne*, 538 F.3d at 195 (noting that "Teflon" and "Thermos" surveys are two recognized methodologies for assessing genericness).  However, they are by no means the only reliable way of evaluating public understanding.  In this case, McMahon based his conclusion on a combination of permissible sources, not merely "haphazard, intuitive inquiry."  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000).

Certainly, he relied partly on his "personal knowledge or experience," but courts, including the Supreme Court, recognize that testimony based on "professional studies" or "experience" can be reliable.  *Kumho Tire*, 526 U.S. at 150-52; *see also Oddi*, 234 F.3d at 158 (acknowledging that "there may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it"); *see also, e.g.*, *United States v. Davis*, 397 F.3d 173, 178-79 (3d Cir. 2005)

(holding that a fourteen-year police veteran with twelve years of experience in narcotics provided a reliable opinion about drug trafficking methods because it was based on his years of experience). Some of the reasons McMahon offers as evidence of MEDDPICC's genericness— such as the fact that it originated and evolved as a sales qualification methodology for years before any trademark usage by Lahoutifard—are undoubtedly reliable in light of McMahon's extensive experience.

Furthermore, his claim that there is widespread adoption of MEDDPICC is based on more than experience alone. It is also grounded in his review and collection of 155 pages of third-party documentary evidence as well as a review of job postings seeking sales professionals with proficiency in MEDDPICC. In light of McMahon's personal knowledge, experience, and evidentiary support, his proposed testimony about genericness and secondary meaning meets the reliability threshold.

Lahoutifard raises a host of other arguments about reliability. He attacks McMahon's alleged omission of certain facts and alleged failure to consider that the market only knows about MEDDPICC because of Lahoutifard's services. These points go to the weight of his proposed testimony, not to admissibility. *See Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (explaining that the Federal Rules of Evidence "place[] the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination").

### iv.    Bias

In a final effort to exclude McMahon's proposed testimony, Lahoutifard argues that it is so tainted with bias that it must be excluded altogether. Lahoutifard characterizes McMahon as a "partisan in the MEDDPICC story with a stake in the outcome" of this litigation. In particular,

13

Lahoutifard contends that a ruling in his favor could somehow "be seen as diminishing McMahon's legacy or control over the [MEDDPICC] concept." Thus, says Lahoutifard, in that they align with his "business and ego interests," McMahon's opinions are "less trustworthy." Lahoutifard further notes that McMahon associates with one of his competitors and has authored a book about sales qualification methodologies that competes with his own.

Even assuming these facts demonstrate that McMahon harbors a personal "bias," Lahoutifard's point is nevertheless misplaced. Nothing in Rule 702 suggests that an expert witness must be neutral or free from bias to offer an opinion. *See generally* Fed. R. Evid. 702. Further, the Third Circuit has held that a district court should generally not consider an expert's "credibility as a witness when assessing the reliability of his methods." *Elcock v. Kmart Corp.*, 233 F.3d 734, 751 (3d Cir. 2000). That holding is unsurprising. After all, experts are retained precisely because their knowledge and opinions support one side's position. To the extent an expert may have some potential bias, the issue ordinarily goes to weight, not to admissibility, and is best left to the factfinder. *See id.* ("[C]redibility is and was an issue solely within the province of the jury that could [not] be considered by the District Court when performing its Rule 702 analysis . . . ."). Accordingly, Lahoutifard's contentions of bias furnish no basis for exclusion.

## III.    SUMMARY JUDGMENT

### A.  Legal Standard

Turning now to Plaintiff's motion for summary judgment, it may be granted if Plaintiff "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a material fact is in "genuine dispute" where "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying the portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party would bear the ultimate burden of proof on an issue at trial, its motion must also demonstrate that "it has produced enough evidence to support the findings of fact necessary to win." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 237 (3d Cir. 2007) (citations omitted). "If the moving party successfully points to evidence of all of the facts needed to decide the case on the law short of trial, the non-moving party can defeat summary judgment if it nonetheless produces or points to evidence in the record that creates a genuine issue of material fact." *Id.* at 238 (citing *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir. 1993)). In the absence of a genuine issue, the movant is entitled to summary judgment because a jury "would be compelled" to find the material facts in the movant's favor. *Id.*

Where the moving party has the burden of proof, the standard is particularly favorable to the nonmoving party. For one thing, a court is permitted to entertain "real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof." *El*, 479 F.3d at 238. Moreover, the nonmovant's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

As a final note, only evidence that would be admissible at trial may be considered when deciding a motion for summary judgment. Fed. R. Civ. P. 56(c)(2); *Arnold Pontiac-GMC, Inc.*

*v. Budd Baer, Inc.*, 826 F.2d 1335, 1339 n.3 (3d Cir. 1987).[3]

### B.  Discussion

With one exception, Plaintiff moves for summary judgment on all claims asserted in this action.[4]

### i.    *Trademark Infringement, Trademark Counterfeiting, and Unfair Competition*

To start, Plaintiff seeks summary judgment on its claim for a declaratory judgment of noninfringement and on all Lahoutifard's counterclaims, which are for trademark infringement and unfair competition under federal and state laws.  These causes of action implicate the same legal standard:[5] (1) there is a valid and legally protectable mark (*i.e.*, a trademark); (2) the party claiming infringement or unfair competition owns the mark; and, (3) another's use of the mark to identify its goods or services is likely to cause confusion about the origin of those goods or services.  *Com. Nat'l Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 437 (3d Cir. 2000); *see also* 15 U.S.C. § 1114(1).  The parties' dispute focuses exclusively on the first

---

[3] The parties have taken this rule to heart, raising evidentiary objections to nearly all materials relied upon by the other.  Their objections will be addressed where relevant.

[4] For reasons not apparent from the briefing or the record, Plaintiff does not seek summary judgment on its claim for trade libel.

[5] *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards."); 15 U.S.C. § 1117 (providing enhanced remedies for particularly egregious instances of trademark infringement under 15 U.S.C. § 1114(1)(a)); *Gideons Int'l., Inc. v. Gideon 300 Ministries, Inc.*, 94 F. Supp.2d 566, 580 (E.D. Pa. 1999) ("The test for [Pennsylvania] common law trademark infringement and unfair competition is essentially the same as the test for infringement and unfair competition under the Lanham Act." (citing *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir. 1994)); *Douglas v. Osteen*, 560 F. Supp.2d 362, 370 (E.D. Pa. 2008) (noting that the UTPCPL's prohibitions on unfair or deceptive practices are modeled on the Lanham Act, and holding that both laws apply the "same legal standards" where the claim is that a practice will cause a likelihood of confusion as to the source of goods or services).

Lanham Act claims also have an interstate commerce requirement.  *See* 15 U.S.C. § 1127 (defining "commerce," as used throughout the Lanham Act, as "all commerce which may lawfully be regulated by Congress").  That component is not at issue here.

element: whether MEDDPICC is a valid mark.

Valid marks "must be 'distinctive,'" *Parks LLC v. Tyson Foods, Inc.*, 863 F.3d 220, 230 (3d Cir. 2017), meaning "the public recognizes [them] as identifying the claimant's 'goods or services and distinguishing them from those of others,'" *A.J. Canfield*, 808 F.2d at 296 (quoting 1 J. McCarthy, *Trademarks and Unfair Competition* § 15.1 (2d ed. 1984)). That determination hinges on categorizing a term into one of four classes: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; or, (4) generic. *Id.* These categories represent both a designation's eligibility for trademark protection as well as the standard for testing its origin-indicating quality. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (explaining that the classes are arrayed roughly according to a mark's "eligibility to trademark status and the degree of protection accorded").

First, there are arbitrary or fanciful terms—which bear no logical or suggestive relation to the actual characteristics of the product—and suggestive terms—which suggest characteristics of a product. *A.J. Canfield*, 808 F.2d at 296. Terms that fall into either of these categories are considered "inherently distinctive," *Parks LLC*, 863 F.3d at 230, and therefore "automatically qualif[y]" as trademarks, *A.J. Canfield*, 808 F.2d at 297.

Next are descriptive terms. As their name implies, they describe a characteristic or quality of a product. *Id.* at 296. Descriptive terms are protected only to the extent that they have acquired "secondary meaning," *id.* at 297, which "exists when the mark 'is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services,'" *Parks LLC*, 863 F.3d at 231 (quoting *Com. Nat'l*, 214 F.3d at 438).

Finally, "at the lowest end of the distinctiveness scale," *U.S. Pat. & Trademark Off. v.*

17

*Booking.com B.V.*, 591 U.S. 549, 554 (2020), are generic terms.  "A generic term is one that refers to the genus of which the particular product is a species." *Park 'N Fly*, 469 U.S. at 194 (citing *Abercrombie*, 537 F.2d at 9).   Alternatively, to avoid taxonomic jargon, "a generic term names a class of goods or services." *Booking.com*, 591 U.S. at 556 (quotation marks omitted); *see also Filipino Yellow Pages, Inc. v. Asian J. Publ'ns, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999) (describing generic terms as answering the question "What are you?" as opposed to "'Who are you?' 'Where do you come from?' 'Who vouches for you?'" (citation omitted)).  Generic terms are "never protectable." *A.J. Canfield*, 808 F.2d at 297.  Thus, it's easiest to think of them as not even trademarks.  *See Parks LLC*, 863 F.3d at 230 n.16 ("Wholly generic names cannot have trademark significance . . . .").  The categorization of a mark along the spectrum of distinctiveness is a question of fact.  *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 n.18 (3d Cir. 1991) ("The characterization of a mark is a factual issue for the jury." (citations omitted)).

> a.   <u>MEDDPICC is not a valid mark for business education services and content because it is generic</u>

Plaintiff has moved for summary judgment on the ground that MEDDPICC is an unprotectable generic term.  The parties agree that because Lahoutifard has a registered mark, Plaintiff has the burden of proving MEDDPICC's genericness.[6]  Consequently, summary

---

[6] This agreement stems from their shared reading of the Lanham Act, which provides that registration of a mark on the principal register "shall be prima facie evidence of the validity of the registered mark."  15 U.S.C. §§ 1057(b), 1115(a).  Like the parties, a majority of federal courts of appeals interpret those provisions to have a burden-shifting effect on the question of a registered mark's validity.  *See* 5 McCarthy § 32.138 (explaining that the First, Second, Sixth, Eighth, Tenth, Eleventh, and Federal Circuits interpret the "prima facie evidence" language to shift the burden of persuasion to the challenger of a registered mark).  The parties' interpretation is also consistent with the Third Circuit's treatment of the burden of proof in cases involving unregistered marks.  *See, e.g.*, *A.J Canfield*, 808 F.2d at 297 ("Because a nonregistered mark has no presumption of validity, the burden of proving chocolate fudge soda suggestive or descriptive, as Canfield claims, lies on Canfield."); *Parks LLC*, 863 F.3d at 226 ("[T]he owner of an unregistered mark 'has the burden of proving the existence of a protectable mark.'" (ellipsis omitted) (quoting *E.T. Browne*, 538 F.3d at 191)).  *But see Com. Nat'l*, 214 F.3d at 428 (suggesting that the holder of a registered mark has

judgment is appropriate only if a reasonable jury "would be compelled to find," *El*, 479 F.3d at 238, that MEDDPICC is generic.

At common law and under the Lanham Act, generic terms are categorically ineligible for trademark protection. *See Del. & Hudson Canal Co. v. Clark*, 80 U.S. (13 Wall.) 311, 323 (1872) ("Nor can a generic name, or a name merely descriptive of an article or its qualities, ingredients, or characteristics, be employed as a trademark and the exclusive use of it be entitled to legal protection"); 15 U.S.C. §§ 1052(e), 1064(3). That reflects a judicial and legislative determination that the need of competitors to "'call an article by its name'" is more important than a markholder's need to distinguish its goods from others. *A.J. Canfield*, 808 F.2d at 297, 305 (quoting *Abercrombie*, 537 F.2d at 9). As the Third Circuit has explained: "Underlying the genericness doctrine is the principle that some terms so directly signify the nature of the product that interests of competition demand that other producers be able to use them even if terms have or might become identified with a source." *Id.* at 304.

The test for determining whether a term is generic is "the primary significance test," which asks "whether the consuming public understands [the mark] to refer to a product genus or to a producer." *E.T. Browne*, 538 F.3d at 195. Although neither party explicitly defines the relevant consuming public, each seems to regard sales professionals as the target audience of their training services. Accordingly, the test becomes whether sales professionals primarily understand MEDDPICC to refer to a genus of goods or services or to a producer.

A few parameters guide that inquiry. For one thing, the primary significance test does not require that the public identify Lahoutifard specifically as the producer; instead, it suffices if

---

the burden of establishing secondary meaning if the mark has not achieved the status of "incontestability" under the Lanham Act, 15 U.S.C. § 1065). Accordingly, because there is support for the parties' shared interpretation, it will not be disturbed.

the public understands that MEDDPICC primarily signifies *some* producer. *See id.* at 194 n.6

("The public need not know the identity of the producer for the primary significance of the term

to be the producer." (citing *A.J. Canfield*, 808 F.2d at 300)). Moreover, when applying the test, a

mark should be viewed "as a whole, not dissect[ed] it into various parts." *Id.* at 195 (citing

*Berner*, 987 F.2d at 981). For this reason, the analysis must focus specifically on

"MEDDPICC," not on its variants, such as MEDDIC, MEDDICC, or MEDDPICCR. Finally,

the parties may rely upon "'any competent source'" as "'[e]vidence of the public's

understanding'" of MEDDPICC. *Berner*, 987 F.2d at 982 (quoting *Merrill Lynch*, 828 F.2d at

1570).

### 1. Plaintiff can establish that MEDDPICC is a generic term

With these rules in mind, Plaintiff argues that Lahoutifard's own use of MEDDPICC, the

proffered expert testimony of John McMahon, and third-party public usage of MEDDPICC

constitute evidence that sales professionals primarily understand the term to name a sales

qualification methodology.[7]

Most compellingly, Plaintiff points to numerous instances in the record in which

Lahoutifard acknowledges that MEDDPICC names a sales qualification methodology. These

---

[7] Plaintiff also points to an October 2025 decision issued by an arbitrator according to the Uniform Domain Name Dispute Resolution Policy ("UDRP"), which "requires a domain-name registrant to submit to a mandatory administrative proceeding before an approved dispute resolution service provider to resolve a third party's complaint concerning the registration and use of a particular registered domain name." *Dluhos v. Strasberg*, 321 F.3d 365, 367 (3d Cir. 2003) (quotation marks and citation omitted). Lahoutifard initiated a UDRP proceeding to acquire the rights to the domain registration for www.meddpicc.com. He argued the domain name had been registered and used in bad faith to infringe his registered mark. The single-member panel ruled against him, based in part on its finding that "the term MEDDPICC has a generic meaning as an acronym in sales training."

Lahoutifard argues that the statement is inadmissible hearsay. Indeed, a hearsay concern is present here because Plaintiff offers the UDRP decision for the truth of the panel's reasoning and conclusion. *See* Fed. R. Evid. 801(c). Although Plaintiff contends the document qualifies for Rule 803(6)'s business records exception or Rule 807's residual catch-all, the Court lacks sufficient information to determine at summary judgment whether either exception applies. The UDRP decision will therefore not be considered.

20

examples provide "strong evidence of genericness" because "[a] kind of estoppel arises" where a mark proponent "itself use[s] the term before the public as a generic name" yet simultaneously "claims that the public perceives it as a trademark."  2 McCarthy § 12.13.

Specifically, Lahoutifard's public-facing materials use MEDDPICC as the name of a sales framework.  His MEDDIC Academy website markets "online and blended learning programs on MEDDIC and MEDDPICC® for individuals, managers, trainers, and Enterprise clients."  The site describes MEDDPICC as the "result[] of the Sales and Qualification techniques developed at PTC" and features an infographic defining the term by its constituent letters.  Further, it hosts courses such as "Full MEDDPICC," "Advanced MEDDPICC," "MEDDPICC for Managers," and "MEDDPICC for Trainers."  These course titles convey that the qualification methodology is their underlying subject matter, as they use MEDDPICC alongside a word or phrase signaling a course's comprehensiveness, complexity, or target audience.  The "Full MEDDPICC" course description explains that "MEDDIC, and now MEDDPICC® . . . , is one of the most renowned Sales Frameworks" and "is a set of Sales and Qualification techniques."   Likewise, the "Introduction to MEDDIC & MEDDPICC®" course is described as "a brief introduction to MEDDIC (or MEDDPICC®), which is considered one of the most renowned Sales frameworks."

Lahoutifard's book—*Always Be Qualifying, MEDDIC, MEDDPICC*—also extensively characterizes MEDDPICC as a methodology.  The Preface states: "This book describes the M.E.D.D.I.C. (also known as MEDDPICC) sales methodology in depth."  Chapter Two— "Introduction to MEDDIC/MEDDPICC"—opens by explaining that "MEDDIC, or its longer variant MEDDPICC, is a recognized sales methodology that is *widely used* in technology and other enterprise sales context [sic]"  (emphasis added).  A few lines later, Lahoutifard writes that

"[s]enior sales leaders who come to discover MEDDPICC usually describe it as a sharp and practical methodology in comparison to other methodologies."  And elsewhere, in a section captioned "MEDDIC is a Qualification Methodology," he describes MEDDPICC as "a foolproof methodic approach that *many big and small companies* have successfully applied" (emphasis added).

Throughout this litigation, too, Lahoutifard has consistently acknowledged what his sales materials say: MEDDPICC is an acronym denoting a sales qualification methodology. Specifically, in his deposition, Lahoutifard testified: "MEDDPICC can be considered as an acronym, as a methodology, just as MEDDIC, and as a trademark depending on the context." Lahoutifard reaffirms that understanding in his declaration opposing summary judgment: "MEDDPICC functions as both a framework and a brand in my business."  Obviously, he believes that MEDDPICC serves in part to identify his services and content, but it bears noting that not even he claims that it is his *primary* understanding of the term.  Thus, Lahoutifard's own use of MEDDPICC to name a sales qualification framework suggests that sales professionals would primarily understand MEDDPICC in its methodological sense.  *See, e.g.*, *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 707 (1st Cir. 2007) (observing that a trademark proponent's patent application "us[ed] the term M4 to describe a type of carbine," which was evidence that the proponent "itself has used M4 generically").

That inference is reinforced by Plaintiff's expert John McMahon, who opines that sales professionals, particularly those in enterprise software sales, would understand MEDDPICC to primarily refer to the sales methodology itself.  As set forth above, McMahon is well positioned to offer that testimony.  He was part of the teams that initially developed the MEDDIC framework in the 1990s and then later evolved it into MEDDPICC in 2005.  Over the course of

his forty-year career—through board positions, consulting, and advisory work—he has trained thousands of sales professionals to use MEDDPICC.[8]

His report describes the breadth of MEDDPICC's adoption, particularly among software firms. According to McMahon, MEDDPICC is a widely used qualification framework, leveraged by tech giants and startups alike. For example, it is used by the sales teams of Salesforce, Microsoft, Oracle, SAP, IBM, VMware, DELL EMC, Cisco, HP Enterprise, Google Cloud, and Amazon AWS. Some of these firms have dedicated teams focused on enabling MEDDPICC internally; others rely on a "robust ecosystem of training and consulting providers" that has been generated by "significant and ongoing demand for MEDDPICC expertise." That demand has also produced a market for software tools, platforms, and even AI designed to assist teams in implementing MEDDPICC.

Other evidence of MEDDPICC's widespread adoption derives from McMahon's review of job postings in the Boston area. On Zip Recruiter, twenty-three firms sought sales professionals with familiarity with MEDDPICC. The same search on Indeed Recruiting produced nineteen results. Together, these results indirectly indicate that fluency in the methodology is a "recognized, valued, and expected skill in the software sales talent pool."

Moreover, McMahon opines that "there is no other way to describe the methodology without use of the acronym." That testimony would further support a finding of genericness because it demonstrates competitors' "need to use the word." *E.T. Browne*, 538 F.3d at 198; *see also A.J. Canfield*, 808 F.2d at 306 n.20 ("Courts have long focused on the availability of

---

[8] Lahoutifard raises a generalized hearsay objection to McMahon's expert report, but he does not get into specifics or cite to any law in support of his objection. It is therefore considered forfeited. *See Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion . . . will be deemed waived."); *United States v. Heatherly*, 985 F.3d 254, 270 (3d Cir. 2021) (treating failure to "develop[ ] . . . arguments properly" as forfeiture).

commonly used alternatives in deciding whether a term is generic." (citing *Holzapfel's Compositions Co. v. Rahtjen's Am. Composition Co.*, 183 U.S. 1, 9 (1901))).  In this case, a review of the record unsurprisingly reveals no commonly used alternative terms capable of referring to MEDDPICC.  As McMahon explains, MEDDPICC is "[i]nseparable" from the methodology it describes because it is an acronym that "encodes the entire framework."  No other word could possibly communicate the heuristic embodied in the term itself.

Finally, public usage of MEDDPICC in its generic, methodological sense further buttresses Plaintiff's case.[9]  A 2014 tweet reads: "Had a great conversation on MEDDPICC & value drivers with @1RudySalvdivar!  I'll be a sales director in no time!"  Another tweet from a year later refers to MEDDPICC alongside its variants: "Good interview with @JackNapoli about #MEDDIC (aka MEDDPIC, MEDDPICC, and MEDDICC)."  Lastly, Plaintiff identifies a 2017 video on YouTube titled "The MEDDPICC® Sales Process – David Weiss."  An accompanying transcript for that video, published by *Sales Success Media*, reflects that it features "a methodology called MEDDPICC."[10]  These examples corroborate the broader record.  They

---

[9] Lahoutifard objects that these documents constitute inadmissible hearsay.  The objection is inapplicable because they are not offered for the truth of the third-party statements within them but rather to show the third parties' state of mind—specifically, their understanding of MEDDPICC's primary significance.  *See* Fed. R. Evid. 801(c).

Lahoutifard's authentication objection is similarly without merit.  "The burden of proof for authentication is slight.  All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be."  *McQueeny v. Wilmington Tr. Co.*, 779 F.2d 916, 928 (3d Cir. 1985) (quotation marks and citation omitted).  Plaintiff's tack to authenticating the documents is through the testimony of a witness with personal knowledge.  *See* Fed. R. Evid. 901(b)(1).  Specifically, in an affidavit, Plaintiff's counsel avers the documents are "a true and correct copy of a Compilation of Examples and/or Descriptive use of the Term MEDDPICC in the relevant Industry."  As is, that declaration falls a bit short of explaining that the documents are collected by counsel and depict complete and accurate examples of third parties using MEDDPICC on social media.  Nevertheless, counsel's testimony to that effect "would be admissible in evidence" at trial, Fed. R. Civ. P. 56(c)(2), so the documents may be considered at summary judgment, *see Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238-39 (3d Cir. 2016) (explaining that a proponent of evidence at summary judgment "need only 'explain the admissible form that is anticipated'" at trial (quoting Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment)).

[10] Lahoutifard contends that the video demonstrates recognition of MEDDPICC as a trademark rather than a generic

show public recognition of MEDDPICC as the name of a sales framework years before Lahoutifard obtained his registration.

In sum, Plaintiff's evidence indicates that sales professionals initially became acquainted with MEDDPICC as an acronym for the multi-step sales methodology that it embodies. That understanding of the word has persisted and, if anything, grown over time as the framework has become more widely adopted. A reasonable jury could find that sales professionals primarily understand MEDDPICC to name a sales qualification methodology. As explained above, that conclusion aligns with Lahoutifard's own understanding of the term; he "do[es] not dispute that MEDDPICC has been used to describe a sales methodology since it was coined."

But Lahoutifard frames the question differently. Rather than asking whether MEDDPICC is a generic name for a sales qualification methodology, he maintains that the question should be whether MEDDPICC is generic as to business education services and content. In other words, Lahoutifard raises a threshold dispute about the relevant genus of goods or services under the primary significance test. *E.T. Browne*, 538 F.3d at 193 (explaining that the primary significance test can be applied "'only after we have determined the relevant genus'" (quoting *A.J. Canfield*, 808 F.2d at 299)).

Statutory text and precedent from the Federal Circuit tell courts to define the relevant genus by reference to the description in the trademark's certificate of registration. *See* 15 U.S.C. § 1064(3) (denying trademark protection to any registered mark that is the "generic name for the

---

term. He specifically notes that the video description box discloses: "MEDDPICC® is a federally registered trademark of Darius Lahoutifard, exclusively licensed by MEDDIC Academy, and is being used with permission." But this disclaimer is not probative of any kind of public recognition. Lahoutifard's declaration explains that it is the result of a "settlement/license" between himself and the video's poster. In other words, the disclaimer reflects an agreement that presupposes the mark's validity; it indicates nothing about the general understanding of MEDDPICC to relevant consumers. *See Colt Defense*, 486 F.3d at 709-10 (holding that a third party's acknowledgement of a registered trademark as "valid and enforceable" was "not probative" of the relevant public's general understanding of the term because it reflected "a legal conclusion for which [the markholder] negotiated").

goods or services, or a portion thereof, *for which it is registered*" (emphasis added)); *Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 640 (Fed. Cir. 1991).  Here, Lahoutifard's registration grants him the exclusive right to use MEDDPICC in connection with e-books and video recordings featuring business topics (class 9) as well as with business education services (class 41).  Put differently, the genera identified in the description are business education services and content, not MEDDPICC itself.[11]  Under trademark law and the facts of the case, however, those two genera are functionally equivalent, and there is ultimately no issue with Plaintiff's framing of the primary significance test.  While that conclusion may not be intuitive, it follows naturally from the underlying policy of the genericness doctrine.

Recall that the genericness doctrine reflects a judgment that, under certain conditions, policy interests in vibrant competition supersede trademark law's interests in preventing consumer confusion.  Specifically, the doctrine denies the right of one individual to "take out of the language" a word that his competitors, present or future, need to identify their goods or services.  *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 810 (2d Cir. 1999).  Trademark law does not confer a linguistic "monopoly over a phrase" when doing so would "substantially disadvantage competitors by preventing them from describing the nature of their goods." *A.J. Canfield*, 808 F.2d at 305.

Now consider Lahoutifard's litigation position.  On the one hand, he sensibly concedes that MEDDPICC is an open concept that anyone is free to learn, teach, and leverage.  Yet at the same time, he claims an exclusive right to use the only word that identifies the very subject of MEDDPICC training services and content.  According to his declaration, he made a deliberate

---

[11] In his brief, Lahoutifard defines the genera as "sales-training programs [and] courses."  However, the phrase "business education services and content" will be used instead because it more closely tracks the language in the certificate of registration while still echoing Lahoutifard's characterization.

choice to "use[] MEDDPICC as a product and program name," believing it was "not just . . . a methodology" but could also serve as a "brand name[]" for his MEDDPICC courses. This choice would leave others no ability to market their competing MEDDPICC-training courses.

So, as a legal matter, it is true "that 'a proper genericness inquiry focuses on the description of services set forth in the certificate of registration.'" *In re Cordua Restaurants, Inc.*, 823 F.3d 594, 602 (Fed. Cir. 2016) (quoting *Magic Wand*, 940 F.2d at 640). But to solve the obvious policy concerns arising from a myopic focus on the registration description, trademark law has developed two principles. The first principle is that if a term is generic for a good, then it is also deemed generic for services that sell or provide that good as a "key aspect" of their business. *Id.* at 603 (holding that the term "churrascos," found to be a generic term for a type of cooked meat, was also a generic term for "a class of restaurants that have churrascos as a central focus of their services"); *see* 2 McCarthy § 12.57 ("A word that names the central focus or subject matter of . . . services is a generic name of the services themselves."); *see also, e.g.*, *In re Emergency Alert Sols. Grp., LLC*, 122 U.S.P.Q.2d 1088 (T.T.A.B. 2017) (concluding that relevant customers would understand "lockdown alarm" to name crisis and security training services in light of evidence that the term is commonly understood as a type of emergency warning device); *In re Candy Bouquet Int'l, Inc.*, 73 U.S.P.Q.2d 1883 (T.T.A.B. 2004) (holding that because "candy bouquet" is a generic term for a floral-type gift arrangement of candies and chocolates, it is also a generic name for a service selling those goods); *In re A La Vieille Russie, Inc.*, 60 U.S.P.Q.2d 1895 (T.T.A.B. 2001) (refusing registration for the mark "Russian art" when used to designate "art dealership services in the field of Russian art" because it was a generic name for the type of art sold by the trademark applicant).

The second principle is that "a term is generic if the relevant public understands the term

27

to refer to part of the claimed genus of goods or services, even if the public does not understand the term to refer to the broad genus as a whole." *Cordua*, 823 F.3d at 605.  For example, "the term 'pizzeria' would be generic for restaurant services, even though the public understands the term to refer to a particular sub-group or type of restaurant rather than to all restaurants." *Id.*; *see also* 15 U.S.C. § 1064(3) (denying trademark protection to any registered mark that is the "generic name for the goods or services, *or a portion thereof*, for which it is registered" (emphasis added)).

Applying these principles in tandem here, they render Plaintiff's evidence sufficient as a matter of law.  Plaintiff's evidence indicates that MEDDPICC is a generic name for a "good" (*i.e.*, a sales qualification methodology).  Under the first principle, that evidence then also establishes that MEDDPICC is a generic name for MEDDPICC-focused training services and content.  Then, under the second principle—treating a genus and one of its sub-genera equivalently—the evidence is also deemed to establish that MEDDPICC is a generic name for the genus of business education services and content, as well as for a MEDDPICC-specific sub-genus.

In sum, Plaintiff, who has the burden of proving genericness, has met its initial burden at summary judgment.  On the evidence presented, a reasonable jury could find that MEDDPICC is a generic term for business education and content because it could find that MEDDPICC's primary significance to sales professionals is to name a type of sales qualification methodology.

### 2.   *Lahoutifard fails to show that there is a genuine dispute about whether MEDDPICC is generic*

The burden now shifts to Lahoutifard.  To defeat summary judgment, all he must do is identify record evidence that indicates the consuming public primarily understands MEDDPICC to name a source.  Even when viewing his evidence in the light most favorable to him, it falls

28

short of demonstrating a triable dispute.[12]

Lahoutifard first points to his early adoption and "brand use" of MEDDPICC. Specifically, he notes that his website—meddpicc.net—features a "MEDDPICC Sales" logo graphic, provides a MEDDPICC definitional graphic, and offers MEDDPICC-branded courses and certifications. Much of this evidence weighs against him, as it is the same evidence cited by Plaintiff to demonstrate that Lahoutifard recognizes MEDDPICC's intrinsic methodological meaning. More importantly, however, the "core deficiency" of Lahoutifard's "brand use" evidence is that while it shows him using MEDDPICC in connection with his services, nothing about it reflects how the public understands the term. *Cf. E.T. Browne*, 538 F.3d at 199 (applying the same reasoning in determining whether a mark had acquired secondary meaning in the minds of consumers). It is simply not probative of genericness.

For similar reasons, Lahoutifard's reliance on evidence about *Plaintiff*'s use of the term MEDDPICC is misplaced. Lahoutifard notes that Plaintiff describes MEDDPICC as an "operating system" and, similar to his services, offers a "MEDDPICC Masterclass." Again, that usage further underscores MEDDPICC's methodological significance and indicates nothing about consumer understanding.

Moreover, contrary to Lahoutifard's contention, it is irrelevant that Plaintiff holds a U.K. trademark registration in the term MEDDPICC because "[t]rademark standards do not traverse international borders." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 714 (3d Cir. 2004).

---

[12] Plaintiff contends that Lahoutifard relies on previously unproduced documents in his effort to defeat summary judgment. Generally, "[t]he consequence of failing to provide facts and documents in discovery, when required in pretrial disclosures or requested during discovery, is that such evidence cannot be used in opposition to summary judgment." *Read v. Profeta*, 397 F. Supp.3d 597, 648 (D.N.J. 2019). Lahoutifard, however, has not had a chance to respond to Plaintiff's accusation, and it is unclear from Plaintiff's briefing whether he was even required to produce the materials at issue. For purposes of this Motion then, it will be assumed that they are legitimately part of the record. It will also be assumed that Lahoutifard's evidence would be admissible at trial.

Instead, "'trademark rights exist in each country solely according to that country's statutory scheme.'" *Id.* (quoting *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisa*, 754 F.2d 591, 600 (5th Cir. 1985)). Accordingly, "'[w]hen trade-mark rights within the United States are being litigated in an American court, the decisions of foreign [authorities] concerning the respective trade-mark rights of the parties are irrelevant and inadmissible.'" *Id.* (quoting *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir. 1956)).

Lahoutifard adduces some evidence of third-party usage of MEDDPICC, but it still does not create a genuine dispute. In fact, one document—a LinkedIn post—affirmatively undermines Lahoutifard's argument. It reads: "Happy to share that I am officially MEDDPICC® Certified through MEDDIC Academy! MEDDPICC is more than an acronym— it's a powerful framework for navigating complex, enterprise-level sales cycles with precision. From identifying key metrics and pain points to understanding decision processes, building champions, and anticipating competition, this methodology sharpens deal strategy and execution." Evidently, this individual understands MEDDPICC to refer to a sales qualification methodology. And his clarification that the certification was provided "through MEDDIC Academy" further suggests that MEDDPICC, as a standalone term, did not name a particular provider of business training services. Finally, Lahoutifard relies on a document that appears to represent four customers' inquiries about his MEDDPICC courses and a "MEDDPICC® App." These messages were directed to Lahoutifard and inquired about pricing, upgrades, discounts, and waitlists for his courses. Accordingly, it is reasonably clear that the customers used MEDDPICC to refer to the subject matter underlying his training services: the sales qualification methodology itself.

That is the totality of Lahoutifard's evidence on genericness.[13]  Little, if any, part of it demonstrates use of MEDDPICC in a trademark sense, let alone provides a sufficient basis for a jury to conclude that the relevant consuming public primarily understands MEDDPICC to name a producer.  Accordingly, a jury "would be compelled to find," *El*, 479 F.3d at 238, that MEDDPICC is a generic term for business education services and content.  And on that basis, Plaintiff is entitled to summary judgment on all of Lahoutifard's counterclaims and on its claim for a declaratory judgment of noninfringement.[14]

### ii.    *Cancellation of Lahoutifard's Registered Mark*

Federal courts are authorized to "order the cancelation of registrations" in trademark infringement suits.  15 U.S.C. § 1119; *see B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 155 (2015) ("[D]istrict courts can cancel registrations during infringement litigation, just as they can adjudicate infringement in suits seeking judicial review of registration decisions."); *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873 (3d Cir. 1992) (explaining that federal courts have "concurrent power" with the PTO to conduct cancellation proceedings).  Cancellation is appropriate where, as here, a term is found to be generic.  *See* 15 U.S.C. § 1064(3); *Park 'N Fly,* 469 U.S. at 194 ("[A] registered mark may be canceled at any time on the grounds that it has become generic.").  Plaintiff is therefore entitled to its request for

---

[13] He also claims to have evidence of actual and potential consumer confusion stemming from his and Plaintiff's simultaneous use of MEDDPICC.  Evidence of consumer confusion simply has no bearing on whether a term is generic.  *See Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 144-45 (4th Cir. 2000) (disregarding evidence of actual consumer confusion in the genericness analysis).

[14] The Court need not resolve a separate dispute about whether MEDDPICC has acquired secondary meaning.  If a term is generic, then it cannot receive trademark protections, even if it has acquired secondary meaning.  *See A.J. Canfield*, 808 F.2d at 297 (""[E]vidence of secondary meaning is not even relevant if the term is . . . generic." (citing *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 n.6 (7th Cir. 1986)); *Abercrombie*, 537 F.2d at 9 ("[P]roof of secondary meaning, by virtue of which some 'merely descriptive' marks may be registered, cannot transform a generic term into a subject for trademark.").

declaratory relief ordering cancellation of Lahoutifard's mark on the principal register.

### iii.    Tortious Interference with Contractual Relations

Finally, Plaintiff seeks summary judgment on its claims for tortious interference with

contractual and prospective contractual relations.  Under Pennsylvania law, these claims require

a plaintiff to prove:

> (1) the existence of a contractual, or prospective contractual relation between itself and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring; (3) the absence of a privilege or justification on the part of the defendant; (4) the occasioning of actual legal damage as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant.

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 530 (3d Cir. 1998) (citing

*Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. 1987)).

With respect to the third element, there is no dispute that a defendant is privileged in

acting to protect his intellectual property.  *See Glenn v. Point Park College*, 272 A.2d 895, 899

(Pa. 1971) (describing privileged or justified interferences as those "which are sanctioned by the

rules of the game which society has adopted" or constitute "socially acceptable conduct which

the law regards as privileged" (quotation marks and citation omitted)).  Here, Plaintiff

acknowledges that Lahoutifard was attempting to enforce his trademark registration, but it

maintains that Lahoutifard's actions were unprivileged because: (1) MEDDPICC is a generic

term in which Lahoutifard lacks a valid intellectual property interest; and, (2) Lahoutifard

enforced his registration against Plaintiff even when it made noninfringing use of MEDDPICC.

On its first theory, Plaintiff seems to argue that Lahoutifard knew or should have known

that MEDDPICC was generic.  Nothing in the record supports that assertion, and Plaintiff cites

no authority for the notion that a defendant's acts are unprivileged where he attempts to enforce a

32

registered mark later found to be invalid.

Plaintiff has similarly failed to provide legal support for its second theory. Even assuming without deciding that Lahoutifard over-enforced his mark, Plaintiff provides no authority or reasoning to deem that activity as unprivileged. Accordingly, Plaintiff has not shown that it is entitled to summary judgment on its contractual interference claims.

An appropriate order follows.

**BY THE COURT:**

S/ **WENDY BEETLESTONE**

_____

**WENDY BEETLESTONE, C.J.**